

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00093-CV

_____

IN THE INTEREST OF D.R., R.R., A.R., AND J.R., CHILDREN

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-713175-22

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

The trial court terminated the parental rights of Appellants B.R. and D.T. (collectively, Parents) to their adopted children, D.R. (Diego), R.R. (Ricky), A.R. (Adan), and J.R. (Josh).[1] In three issues, they argue that the trial court abused its discretion by admitting hearsay evidence of abuse, that insufficient evidence supports the predicate termination grounds as to Josh, and that insufficient evidence supports the trial court's best interest finding as to Josh.[2] Because Parents did not preserve their first issue and because sufficient evidence supports the trial court's findings, we affirm.

## Background

In February 2022, the Department of Family and Protective Services filed a petition for protection of a child, for conservatorship, and for termination of Parents' parental rights as to the children. The Department also requested and received an emergency order allowing it to take possession of the children.

At the time, the household consisted of seventeen-year-old C.R. (Craig), sixteen-year-old Diego, fourteen-year-old Ricky, nine-year-old Adan, four-year-old

---

[1] To protect the anonymity of the children associated with this appeal, we use a pseudonym to refer to the children, their family members, and, where relevant, their godparents and current placements. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] Parents challenge the predicate termination grounds as to all the children, but they contest the termination only as to Josh.

Josh, and four-year-old X.R. (Harry). Harry was a foster child who had been placed in the home; all the other children had been adopted by Parents. Craig had been adopted through a private adoption, but Diego, Ricky, Adan, and Josh had been placed with Parents by the Department.

The Department became involved after receiving a report from Adan's godmother, W.H. (Winnie), that when visiting her and her spouse for the weekend of February 4, 2022, Adan had begun crying and told her that B.R. had been hitting him and had thrown him against a wall. When it was time for Adan to return home, he began throwing up and pleaded with Winnie not to report what he had said because B.R. had threatened him with being taken to juvenile detention and never seeing his godparents again. Adan said that B.R. had told the children that he would kill them if they said anything.

Several days later, Department investigator Antionne Cruz interviewed Adan at his school. According to Cruz's affidavit, which was attached to the Department's petition, the school's principal told Cruz that the day before, Adan had asked to speak to one of the school's counselors. B.R. contacted the principal that day asking her who had made a CPS report about Adan and told her that Adan should not be questioned because he gets confused and tells lies.

Cruz then learned that Adan was in the school counselor's office as a follow-up from the previous day. The counselor reported that Adan had said that he was afraid to go home. Cruz spoke to Adan, who told her that B.R. had said that if talked to CPS

3

"about bad things," CPS would put him somewhere worse, and that if he told anyone about how he was punished, B.R. would kill him. Adan said that he believed what B.R. said because he had seen B.R. beat up Diego and hold Diego's head underwater in the backyard pool. He also stated that B.R. had once killed one of their dogs.[3] Adan told Cruz that B.R. hits him with a leather "flap" and a back scratcher, that he was recently thrown into a wall, and that he had once been thrown into a glass shower wall. He also said that he sometimes does not get to have dinner and has to go to bed hungry. Cruz observed bruises on Adan at different stages of healing and scars on his head, arms, and legs. She took pictures of the injuries.

Cruz's affidavit included her notes about her investigation, and she further included notes of five previous investigations by the Department, all of which had been ruled out. The Department additionally included affidavits from Dr. Elizabeth Peeler; Stacey Fox, who is the pastor of the church that Parents attended; and Karen Parker, E.T. (Evelyn), and S.T. (Shea), who all attended the same church. Evelyn is Diego's godmother, and Shea is her spouse. Because they attended the same church, Evelyn knew Parents before they adopted the children; at the time of trial, she had known them for about five years.

_____

[3]Parents breed dachshunds.

Dr. Peeler stated in her affidavit that she had reviewed the photographs of injuries to Adan. In her opinion, the injuries supported Adan's disclosure and were "concerning for child physical abuse."

E.T. stated in her affidavit that Diego had been living with her and Shea ever since an incident involving Parents' pool, which Diego had told her involved B.R.'s punching him and holding his head under the water because B.R. was unhappy with how Diego had done some yard work. Diego managed to get away and went to Pastor Fox's house, which was nearby. She also reported having seen scratches and bruises on Adan on several occasions.

Shea described injuries she had seen on Adan in the past. She further stated that she had once visited the family and found Diego crying in his closet because of B.R.'s yelling.

Parker stated that on multiple occasions, Craig and Diego had stayed with her for a few days at Parents' request due to "fighting and the house being torn up." Parker stated that both children had told her that B.R. threatened them, telling them not to speak to CPS or to lie or else CPS would put them back into the foster system where they would be "abused and raped and molested." She stated that Josh had regressed and was no longer potty trained, that she had seen bruising and marks on the children at different times, and that she had been present when B.R. was yelling and cussing at the children.

5

Pastor Fox stated that he had seen bruises and marks on Adan several times, that he initially believed Parents' claim that Adan was just clumsy, but he had begun to suspect something else. Fox's concerns had been allayed somewhat by the fact that the children spent so much time staying with other people. Fox stated that twice Diego had showed up at his door late at night with no shoes or shirt on, and that when he called Parents to tell them that he had Diego, he was told that they had never wanted him. While Diego stayed with Fox, Diego was not aggressive or disrespectful. After the pool incident, Diego would not let Fox take pictures of his injuries. Fox described B.R. as "unhinged," "dangerous," and "a pathological liar."

During the pendency of the proceedings, Adan was placed with his godparents, Winnie and her spouse, and Diego continued to stay with his godparents, Evelyn and her spouse. Because of his health issues, Ricky was moved to a group home.[4] Josh, however, was moved multiple times. He was initially placed at a home in Houston, but because it was difficult to take him to Fort Worth for his visitations, he was moved to a therapeutic foster home in Garland. His behavioral issues escalated at the home, and he was placed in a psychiatric hospital. At Parents' urging, his placement was then changed to his godparents. He was removed from that home after he

---

[4]The Department's caseworker, Alyssa Dougharty, stated that because of Ricky's dialysis, he required a primary medical needs placement. *See* Tex. Admin. Code § 749.61 (stating that a child with "primary medical needs" "cannot live without mechanical supports or the services of others because of life-threatening conditions").

reported receiving physical punishments. The Department then placed him with Evelyn, where his behavioral issues again led to placement in a psychiatric hospital.

At trial, the Department called the children's caseworker, Cruz, Evelyn, and the psychologist who was Josh's doctor during part of the case. The Department did not call Parker, Pastor Fox, or Shea to testify about the matters discussed in their affidavits. Parents both testified in their defense, and they also called their respective psychologists, two nurses who had cared for Josh and Ricky before their removal, and Josh's godmother.

At the conclusion of trial, the trial court found the predicate termination grounds in Texas Family Code Section 161.001(b)(1)(D), (E), and (O) and that termination was in the children's best interest. Accordingly, the trial court terminated Parents' parental rights to the children.

## I. Hearsay Evidence of Abuse

In Parents' first issue, they argue that the trial court abused its discretion by allowing hearsay evidence about the abuse against Adan and Diego. They specifically complain about records from Alliance for Children regarding Adan and Diego, and particularly the therapists' notes contained within those records; Adan's and Diego's medical records from Cook Children's Medical Center; testimony about statements in the records; and witness testimony about statements that Adan had made regarding abuse against him and against Diego.

7

**A. Standard of Review**

We review for abuse of discretion a trial court's rulings in admitting or excluding evidence. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. An appellate court must uphold the trial court's evidentiary ruling if the record shows any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

**B. Analysis**

We start with the two exhibits containing the Alliance for Children records for Adan and Diego. Before trial, the Department filed notices of filing business records as to the records. The Department also filed notices of business records affidavits as to Adan's and Diego's medical records from Cook Children's. Each notice stated that the records had been served on Parents' attorney. When the records were offered at trial, Parents' attorney objected, "I'm sure there are plenty of hearsay statements contained within, and we have a hard time agreeing just to allow these records to come in without being able to cross-examine the scribe or the provider." But the

attorney did not point out any specific parts of the exhibits that contained the objectionable hearsay statements.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Tex. R. Evid. 805. Regarding the Alliance for Children records, Parents did not object to the sufficiency of the business records affidavits or otherwise object that the business records exception did not apply. As for any additional layer of hearsay within the records, Parents' attorney's objection that she was "sure there [we]re plenty of hearsay statements" in the records failed to identify which parts of the records contained the objectionable hearsay. The general objection was insufficient to preserve error as to the records' admission. *See In re J.H.*, No. 02-22-00457-CV, 2023 WL 310187, at *2 n.5 (Tex. App.—Fort Worth Jan. 19, 2023, no pet.) (mem. op.); *L.M. v. Dep't of Fam. & Protective Servs.*, No. 01-11-00137-CV, 2012 WL 2923132, at *5 (Tex. App.—Houston [1st Dist.] July 12, 2012, pet. denied) (mem. op.); *Flores v. City of Liberty*, 318 S.W.3d 551, 560 (Tex. App.—Beaumont 2010, no pet.).

As for the medical records, when the Department moved to admit them, Parents relied on the same general objection that they had made to the therapy records.[5] For the same reason that the objection was insufficient to preserve error as

[5]When the Department moved to admit the second set of Alliance for Children records, the trial court asked Parents if they had any objection, to which their attorney responded, "I would just reiterate my—my previous objection about the hearsay contained within." For the next two sets of records, which were the medical records,

9

to admission of the therapist records, it was insufficient to preserve error as to admission of the medical records. Further, on appeal, Parents do not argue that the business records affidavit did not apply and do not tell us what parts of the medical records were inadmissible as hearsay within hearsay. *See* Tex. R. App. P. 38.1(i).

Later in the trial, Parents did make a more specific objection when the caseworker was asked to read aloud an excerpt from Adan's therapy records regarding statements that Adan had made to the therapist. At that time, Parents' attorney stated, "I understand these are in evidence[,] but I've made a hearsay objection and I would like for the counselor to be here to talk about this" because the testimony was "hearsay within hearsay within hearsay and with this witness just reading off, you know, . . . what the child allegedly said to the counselor."

The Department disputed the hearsay-within-hearsay argument, asserting that the records were admissible under the business records exception and that Adan's statements in the records were admissible under the medical treatment exception. *See* Tex. R. Evid. 803(4), (6); *see also J.H.*, 2023 WL 310187, at *3 (upholding admission under medical treatment exception of children's therapist's notes about what the children had told the therapists about their abuse and stating that "[c]ourts may infer

---

Parents' attorney articulated her objection as her "running hearsay objection." However, Parents did not ask the trial court to grant a running objection, and the trial court never stated that it had granted one. Even assuming that Parents meant (and the trial court understood them to mean) that they were making the same objection they had made to the other records, the objection was still insufficient to preserve error.

from the record that the out-of-court declarant was aware that the statements were made for purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended upon the veracity of such statements"). Parents responded that the medical treatment exception did not apply because "we have no idea about demeanor, about tone, nothing."[6] The trial court overruled the objection. The caseworker then testified that the therapist's note said that Adan had reported that Parents "would throw him into the washer and walls, hit him, and not feed him."

A successful challenge to the trial court's evidentiary rulings generally requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g). Here, the statements that the caseworker read aloud were from records that had already been admitted. *See In re T.D.*, No. 02-22-00215-CV, 2022 WL 11483054, at *6 (Tex. App.—Fort Worth Oct. 20, 2022, pet. denied) (mem. op.). Further, the investigator, Cruz, had already testified without objection that Adan had made similar statements to her about being thrown against the wall and sometimes having food withheld from him. *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007); *Richardson v. Green*, 677 S.W.2d 497,

---

[6]When Parents made this argument, the trial court overruled the objection after responding, "Okay. You could have brought them in, right?" On appeal, Parents argue that the trial court improperly put the burden on them to bring the medical providers to testify. However, we need not address this argument. As stated, the records were already in evidence, and therefore there was no harm resulting from the admission of the caseworker's testimony about what the records contained.

501 (Tex. 1984).[7] She further testified without objection that Adan had told her he had once been thrown against a glass shower door. Thus, regardless of whether the objected-to testimony from the caseworker about the records' contents fell into any hearsay exception, any error in admitting the testimony was harmless. *See Bay Area Healthcare Grp.*, 239 S.W.3d at 235; *T.D.*, 2022 WL 11483054, at *6.

Parents further complain about Cruz's testimony that Adan had alleged that Diego was also a victim of abuse, and they argue that the hearsay exception relied on by the Department at trial, Family Code Section 104.006, does not authorize a child's statements about abuse against another child. Parents did not, however, preserve their complaint, as the following exchange shows.

> Q. (By [the Department]) Now, when you talked to [Adan], did he ever—did he make statements regarding abuse or neglect that occurred with other household members?
>
> A. Yes.
>
> Q. And what other statements did he make regarding others being abused or neglected?
>
> [Parents]: I'm gonna object to the hearsay statement by a child.

---

[7]Cruz had also testified without objection about a description of the abuse that Adan had provided to a nurse, which the nurse had included in Adan's medical records. Parents also did not object when the caseworker testified that Adan and Diego had "continued to be consistent in their counseling regarding their abuse and neglect outcries." Further, when Cruz read excerpts from Diego's medical records, Parents did not object to that testimony.

[The Department]: Judge, 104.006 doesn't require that the abuse or neglect that a child outcries to be subject to the child. They can make outcries as to any abuse or neglect that occurs in the home.

[Parents]: And, Judge, he's not asking—well, I don't think he's laid the predicate for this round of questioning, right? And then also . . . I think he's asking for just, Well, tell me everything that he said. It's not specific as to any kind of outcry.

[Department]: Judge, I think this is very specific. I asked if she was—that if he made statements regarding [Diego]—sorry. Strike that—regarding any other household members being abused, and she said yes.

THE COURT: All right. Help her out a little bit with which child we're talking about.

[The Department]: Okay. I can, Judge.

Q. (By [the Department]) Who did he indicate was the recipient of abuse or neglect in the home?

A. [Diego] R[.]

Q. Okay. And what did he say regarding [Diego]?

A. That he was beaten up and attempted to be drowned.

Q. Okay. Did you go into detail about that?

A. No.

Q. Did he indicate that this abuse happened once or more than once?

A. More than once.

In summary, after the Department raised Section 104.006 as a hearsay exception, Parents objected to a lack of predicate and a lack of specificity in the question, but to the extent that the objection could be construed as asserting that the

13

statute does not allow a witness to testify about a child's outcry of abuse against a different child, they did not secure a ruling on it. Further, once the Department elicited further testimony to clarify the other child about whom Adan had made an outcry, Parents made no further objection to the applicability of Section 104.006 and did not object to the trial court's failure to rule on their initial objection. Accordingly, they did not preserve their complaint for appeal.[8] *See* Tex. R. App. P. 33.1 (requiring a party to preserve complaint by objecting and by securing ruling on objection or objecting to refusal to rule); *Rushing v. Divine Homes, LLC*, No. 02-21-00397-CV, 2023 WL 1859454, at *11 (Tex. App.—Fort Worth Feb. 9, 2023, no pet.) (mem. op.) (noting that a party preserves error by objecting and obtaining a ruling, that if a trial court refuses to rule, the party preserves error by objecting to that refusal, and that if the trial court does not rule and the party does not object to the refusal to rule, error is not preserved); *see also In re K.H.*, No. 10-21-00073-CV, 2021 WL 4080261, at *2 (Tex. App.—Waco Sept. 8, 2021, pet. denied) (mem. op.) (considering parent's complaint that child's statements about drug use in the home were not reliable and

_____

[8]In part of their briefing for this issue, Parents complain that Section 104.006 did not apply to outcries by Diego that were reflected in the records because Diego was older than twelve. *See* Tex. Fam. Code Ann. § 104.006. We do not address that argument because Parents did not preserve their hearsay objection when the records were admitted. In a single sentence of their brief, Parents complain that the trial court "made no inquiry as to the circumstances that would have permitted the use of the records in lieu of any of the children's testimony." They do not, however, elaborate on what inquiry the trial court should have made but did not. To the extent this sentence of their brief makes the same complaint as their "lack of predicate" objection in the trial court, it is inadequately briefed. *See* Tex. R. App. P. 38.1(i).

therefore were not admissible under Section 104.006 and holding that the complaint was not preserved because parent's only Section 104.006 objection at trial was that the statements did not concern abuse or neglect).

Finally under this issue, Parents complain that after the trial court allowed the caseworker to read excerpts from the therapist records, "every [Department] exhibit was admitted over objection without regard for reliability or relevance or authority." Parents do not tell us what the other exhibits were, what objection they had raised to each exhibit, or where in the record we may find their objection, and they do not explain why the trial court's ruling on the objection was incorrect. Accordingly, to the extent that Parents argue that the trial court abused its discretion by admitting the Department's other exhibits, the argument is inadequately briefed. *See* Tex. R. App. P. 33.1, 38.1(i). We overrule Parents' first issue.

## II. Endangerment Termination Grounds

In Parents' second issue, they assert that, with respect to the termination of their parental rights to J.R., the evidence at trial was insufficient to prove by clear and convincing evidence the predicate termination grounds in Texas Family Code Section 161.001(b)(1)(D), (E), and (O), the grounds found by the trial court.[9] Parents do not specify whether they are challenging legal or factual sufficiency, but because they

---

[9]As previously noted, Parents do not contest the termination of their rights regarding the other children, but they do contest the trial court's endangerment finding as to those children.

15

request that we reverse the trial court's judgment and remand for further proceedings, we assume that they challenge factual sufficiency. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). However, because evidence that is factually sufficient is necessarily legally sufficient, *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.), our determination below that the evidence is factually sufficient means that the evidence is also legally sufficient.

## A. Standard of Review

When the Department seeks termination, it must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the predicate termination grounds. Tex. Fam. Code Ann. § 161.001(b); *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or

16

belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Accordingly, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

**B. Analysis**

We begin our analysis by setting out the witness testimony relating to the allegations of abuse against Adan and Diego, the behavioral issues that Josh was experiencing at the time of trial and the suspected causes of those issues, the suggestion of abuse against other children in the household, and other matters relevant to the termination grounds.

**1. Testimony and Evidence Regarding Adan**

Regarding Adan, the trial witnesses presented conflicting evidence about whether Parents abused him while he was in their care. The evidence of abuse came from witnesses testifying about Adan's outcries and from photographs taken of bruises and scarring on his body, as well as the therapy and medical records discussed above. The evidence negating abuse came from Parents and several of their witnesses; those witnesses testified that they had never seen any injuries on Adan that raised concerns about abuse.

17

Investigator Cruz and caseworker Dougharty testified about what Adan had told them about abuse in the home, as did Evelyn, Diego's godmother and placement at the time of trial.

- Cruz testified about her investigation in response to the outcry made by Adan, who was nine years old at the time of her interview. When she spoke to Adan at his school, he was "crying, shaking, [and] pacing the room," his eyes were swollen, and his hands were trembling.

- Adan had bruises on his arms and legs, and he said that his injuries were because he had not cleaned up after a dog well enough, and B.R. had thrown him against the wall of the laundry room.

- Adan told Cruz that when the family lived at a previous address, he had been thrown against a glass shower door, which cut his head, but by the time the Department had investigated the injury,[10] the shower door had already been fixed.

- Adan also told Cruz that D.T. would yell at him, and B.R. would hit him. Adan said that he was scared to go home because he was afraid of being subjected to more abuse or being sent to a worse foster home.

---

[10]According to Cruz's removal affidavit, the Department had investigated after a teacher reported seeing a large gash on Adan's head; his hair covered the mark, but the teacher saw it after checking his head when he hit it in class. Adan told the teacher that his father had thrown him into a glass shower door and that he was not supposed to tell his teacher. The teacher reported that since Adan's formal adoption, his teachers had "observed mood changes and [that Adan was] very emotional and fearful of getting in trouble." However, the teacher did not testify at trial, and thus the teacher's statements were not presented to the trial court. That case was ruled out after Parents and other children in the house said that Adan had fallen into a kitchen counter. However, in her removal affidavit, Cruz stated that in the investigation for this case, D.T. said Adan had slipped and fallen in the shower. In her testimony, Cruz was not asked about the details of that prior investigation or of the other investigations done by the Department, and she did not mention D.T.'s new shower-slipping story.

- B.R. came up to the school on the same day that Cruz interviewed Adan, and Cruz spoke to him at that time. B.R. said that Adan's injuries were from playing outside; when another investigator spoke to D.T., he said that the injuries came from riding a bike. Cruz did not believe Parents' explanations because Adan had bruising on his upper arms, which looked like grab marks, but he had no cuts or scrapes.[11] Cruz testified that when she expressed that observation to B.R., he "got inches within [her] face and leaned in" and asked her if she was going to believe a child over Parents.

- Dougharty, the caseworker, testified that Adan had been consistent regarding his neglect and abuse outcries in his counseling sessions. She also stated that in counseling, Adan had reported that his father had killed a dog in front of him.

- Evelyn reported that she had previously seen scratches on Adan's neck and scars in his scalp area. Adan had also made an outcry to her that Parents had hurt him by throwing him in the laundry room and that he was afraid of them. He told her that if Parents found out that she knew about it, he would get in trouble.

Parents' testimony did not shed much light on Adan's injuries. During D.T.'s testimony, he was not asked to confirm or deny that any family violence against Adan had occurred, and he did not offer any explanation for the injuries that Adan had at the time of removal. B.R. denied injuring Adan, but like D.T., he did not provide an explanation for the injuries that Adan had at the time of his removal.

Two former nurses for the children and Josh's godmother testified that they had never had concerns about the children:

---

[11]Cruz's removal affidavit stated that when it was pointed out to D.T. that the bruises "were on the large muscle area of the thighs and calves as well his forearms and biceps" and that he did not have any scrapes on his knees and elbows or anywhere else, D.T. said it was because Adan had fallen on the sidewalk and not in the street. D.T. did not testify about his sidewalk theory at trial, and Cruz was not asked about it, and thus it was not presented to the trial court.

19

- Nancy Carlson was Josh's home health nurse before he was removed from Parents, and in that role, she was in the family's home on weekdays from approximately 6 a.m. to 6 p.m.

- She testified that none of the children had ever made an outcry to her of abuse or neglect. She never noticed any bruising on the children except when she would give Harry and Josh a bath, but the children explained those as resulting from their biting each other.

- Nurse Carlson testified that she had never seen anything that she would consider to be mistreatment of the children or that would make her concerned for them. But she also testified that she once saw Diego hit Adan and give him a black eye, so it is not clear that she would have been concerned with an injury if she were told that it had been caused by one of the other children.

- However, when the Department's attorney showed her the pictures of the injuries that Adan had at the time of his removal, she acknowledged that the injuries were concerning. She was not asked to explain why she had not noticed such injuries on him before his removal. Nurse Carlson did say, though, that because she was focused on caring for medically fragile Josh, she probably would not have noticed everything going on in the house.

- Latasha Traylor, a nurse who had provided weekend nursing care for Josh and Ricky for about seven months in 2020, also testified about her experiences with the family. Nurse Traylor usually worked from 7 a.m. to 7 p.m. After she stopped providing nursing care for the family, she kept in touch, including attending the children's birthday parties.

- Nurse Traylor further testified that none of the children had ever made outcries of abuse to her.

- As part of her job, she bathed Josh, and sometimes before she left for the day, she told Adan to go take his shower, too. On those occasions, she would see Adan with his shirt off, and she never noticed any bruises on him.

- When the Department's attorney showed her the pictures of the injuries on Adan at the time of his removal, she stated that if she saw all those injuries on a child, as a mandatory reporter, she would have to make a report.

- C.H. (Cathy), Josh's godmother, testified that she never noticed any bruises on the children and that the children never made any outcries to her.

- Kathy Partridge, Parents' former neighbor, testified that she never had any concerns about the care that Adan was receiving. Partridge had lived across the street from Parents and was frequently around Adan before his removal because he attended the same school as her grandson, who lived with her, and she gave Adan rides to and from school. She once saw some bruises on Adan, but he told her that they came from falling off his bike.

Several witnesses testified about their opinion on Adan's truthfulness:

- B.R. claimed that Adan "ha[d] been manipulated and lied so much to to where he doesn't know the truth anymore" and that Adan had been told to say that he was being abused.

- Cathy claimed that Adan "lied a lot."

- Partridge, on the other hand, described Adan as a child whom she could trust. She stated that she generally assumed that what he told her was true and that he had never given her a reason to believe that he was a child who lied.

Witnesses also testified about an allegation that Adan had made to Cruz of sometimes being denied food.

- Adan reported to Cruz that on several occasions dinner had been withheld from him. Cruz said that Parents denied withholding food from Adan, and B.R. denied it when he testified at trial.

- Nurse Carlson said that she made breakfast for everyone every weekday morning, so Adan never went without that meal, and that "they had stuff for lunch." She further stated that D.T. would make dinner for the family.

- Nurse Traylor stated that she had also prepared meals for the months that she was there—although it was unclear from her testimony if she had prepared food for the whole family or just for Josh and Ricky—and that she had never noticed any children being excluded from meals. She noted that she had encouraged Adan to eat something for breakfast because he was "a little bit on the small side" and needed encouragement to eat.

In addition to the above testimony, Adan's medical records contained his statements to the medical staff who saw him when he was removed from Parents' care. Those medical records contained the following summary of what Adan and his godmother Winnie told the medical staff at the time of his removal:

> [Winnie] typically had weekend visitations with [Adan] once a month. Stated during these visitations she often noticed bruises[,] but [Adan] always had an excuse. Still, she became increasingly concerned. From 12/26–2/06[,] the adoptive family would not allow [Winnie] to pick up [Adan] as she normally would have[,] which she was told was due to sick symptoms and concerns about Covid-19 exposure. When she arrived to pick him up on 2/11[,] [Adan] "did not look well[";] on the drive home he burst into tears and told her everything, including how he had just been kicked and thrown against the wall and onto the washing machine moments earlier. [Winnie] stated the weekend of 2/11–2/13[,] [Adan] was "a wreck["]; he was emotional and even vomited a few times because he was anxious and scared he would get sent back to the home. He had bruising to his left arm, buttocks, and both legs[,] but he was not complaining of any pain and did not receive any medical care. [Adan]'s last exposure to the home was 2/11.

Adan also reported that "[D.T.] would do the yelling and [that B.R.] was the one [who] physically abused him."

The medical records included notes from Adan's physical exam. Adan had a scar on his head resulting in hair loss; Adan said that the scar was from being thrown into a glass shower. Medical staff further noted bruising on his knees, which he said came from being pushed to the ground, and hyperpigmentation on his lower legs, which he said came from being hit with a leather "flap." The staff described the injuries as "consistent with the history provided, suspicious for child physical abuse."

Further, in Adan's therapy records, his therapist made notes in multiple sessions about Adan reporting abuse by Parents, including his being thrown into walls, being hit, and sometimes not being fed. He further reported domestic violence between Parents. The therapist also noted in one session that Adan had become upset when he had accidentally encountered Parents on the way to a family visit.

The therapy records also included a worksheet filled out by Adan; the worksheet explained what "trauma" means and what kind of events can be traumas, and Adan wrote that "[b]eing physically abused" and "[b]eing verbally abused" were traumas that had happened to him. On another worksheet, he identified Parents as to blame for his abuse because "th[e]y did it."

## 2. Testimony and Evidence Regarding Diego

The parties presented conflicting evidence about whether Diego or Parents were violent in the home. The Department's witnesses asserted that Diego was the victim, not the perpetrator, of abuse.[12] Cruz testified that Adan had told her that Diego also received abuse from Parents. Dougharty stated that like Adan, Diego had

---

[12]The trial court took judicial notice of the CASA report filed before trial. That report noted that when the CASA interviewed Diego, his face "displayed fear, and he immediately spoke up to say he did not want to go back." The report further stated that Ricky had also indicated that he did not want to return to Parents, and his caregiver said that he had "shown a great deal of anxiety about having to interact with [Parents] again." However, the CASA did not testify. *See In re C.F.*, 576 S.W.3d 761, 774 (Tex. App.—Fort Worth 2019, no pet.) (noting that a trial court may take judicial notice of the contents of its file, but it may not take judicial notice of the truth of any factual allegations contained in its file).

been consistent in his abuse outcry in his counseling sessions. Evelyn described a time at church when she had seen B.R. push Diego "hard" and then scream at him. Evelyn further stated that since Diego came into her and Shea's care, he had not had behavioral issues at school, had never needed to be counseled or treated for any violent incidents, and had not been in trouble at school for fighting. Additionally, Diego's counseling and medical records included notes about abuse that he had reported.

Parents, on the other hand, testified that Diego was the aggressor who had attacked D.T. and B.R. at different times. B.R. produced photographs of injuries to his knee and wrist that he contended were from the day of the pool incident, as well as a picture of injuries to D.T. that B.R. said were caused by Diego. Nurse Carlson stated that she would not be alone in the home with Diego because if he did not get his way, "he would just go off on it and, I mean—he was violent." She also stated that she had once seen Diego hit Adan. B.R. asserted that CPS had investigated the pool incident and that Parents had been cleared.[13]

---

[13]The Department did not introduce any records from that investigation. Cruz's emergency removal affidavit stated that abuse had been ruled out because, although Diego stated that B.R. had hit him, "a sibling and both parents stated that [Diego] attacked [B.R.]." The sibling was not identified in the affidavit. There is no evidence of whether that sibling or any of the other siblings were asked about the incident after their removal from Parents' home. Cruz did testify, however, that Adan said in his outcry to her Diego had been abused in the home and "attempted to be drowned."

### 3. Testimony Regarding Josh

- Cruz tried to interview Josh in her investigation, but he would not talk to her. At the time, he had delayed speech.

- Dougharty explained that while Josh was with Parents, he had a feeding tube called a G-button. However, when Josh was examined upon his removal from Parents' care, doctors determined that his feeding tube should be removed.

- Dougharty had no concerns with how Parents engaged with Josh during visits, and she stated that he enjoys the visits. However, she further stated that Josh had been defecating on himself after visits. Further, he had made outcries of seeing one of Parents' dogs, Butter Bean, killed in the house. Dougharty acknowledged that Butter Bean is still alive. But she further explained that when Josh is shown pictures of dogs, he calls many of them Butter Bean.

- Dougharty stated that when Josh came into care, he had difficulty with understanding basic vocabulary. Dougharty further stated that Josh has ongoing behavioral issues in school, "such as hitting other peers," and "some inciden[ts] where he's pulled pants down of other students and laid on top of them. He's [also] hit and kicked teachers, bit teachers, [and] bit other students." However, "in the home, he does well," and "[t]hey've been getting him regulated," and "overall[,] he is a very happy kid."

- Evelyn stated that she had previously seen Josh with a black eye and with bruising on his arms and legs.

The Department also called a psychologist, Dr. Brendel Doss, to testify about Josh. She was Josh's psychologist from September 2022 until January 2023. Dr. Doss testified about Josh's current behavioral issues and symptoms.

- First, Josh had been exhibiting "encopresis, which is basically issues not being able to use the restroom where he's supposed to; and uresis, which means he was urinating on himself." Dr. Doss opined that Josh's problems with bathroom functions indicated a past lack of supervision, neglect, and a lack of training.

- Second, Josh exhibited signs of pervasive neglect, meaning that the neglect happened over a long period of time, not just during the last year that Josh had spent in foster care.

- As examples of pervasive neglect, Dr. Doss stated that Josh did not know words that children his age should know and did not play with toys in an age-appropriate manner. She described him as "act[ing] more like a 2- to 3-year-old . . . than a 4-, 5-, or 6-year-old."

- In her opinion, Josh does not have autism, and thus his issues did not stem from that type of neurodivergence. Further, the behaviors suggesting a neglectful environment could not have been the result of a recent environment "because the behaviors for neglect are still pervasive. And they would have had to occur at different points for him not to understand how to play with toys, for him not to have—for the lack of word knowledge that he has." She explained, "Those occur at ages, you know, zero up to 6 months, 1, 2, 3, or 4. They don't happen magically at 5 and a half. So that, to [her], point[ed] significantly to a long-term neglectful environment, not a recent one."

- Dr. Doss did acknowledge, however, that it can be distressing for a child to be moved so many times in one year.

- Dr. Doss stated that Josh had also shown what she described as "practicing behavior": He once yelled at his guardian in the car, in loud aggressive tone, "Say you love your family; say it; say you love your family." Dr. Doss stated that this behavior showed that he had been "trained to do this to display a certain type of connection and care" and that it was "indicative of a highly controlled environment where he[ was] not able to freely express information or emotion."

- In addition to the above behaviors, Dr. Doss stated that Josh had also shown "anxiety; agitation; verbal and physical aggression; noncompliance with instructions. . . . Some destruction of property, some sexual behavior."

- Dr. Doss also expressed concerns of exposure to physical abuse that had manifested itself in therapy sessions. Josh had attempted to spank Doss during play, and she stated that he is "very aggressive and can be very violent in his play things." She said that Josh had indicated that "daddy" had whooped him, and Josh has threatened to harm teachers, other children at school, and himself. He has also exhibited self-harm; his current

26

hospitalization involved his holding a pair of scissors to his throat after visitation.

In addition to discussing Josh's behavioral issues, Dr. Doss talked about her concerns with Josh being returned to Parents' care. Regarding Josh's visits with Parents during the case, Dr. Doss believed that they did more harm than good.

- Dr. Doss asked Josh about his visits with Parents, but he never said that he looked forward to them, and he did not talk about them. On one occasion, he said he liked the visits, but he then said that he liked leaving. Josh never expressed fear of Parents, but he also never expressed any excitement at the idea of returning to them.

- Further, during the period in which she was treating Josh, after nearly every visit with Parents, he had an episode of defecating on himself. He also was "agitated, irritable," and usually had an outburst when he got back to school.

- Dr. Doss acknowledged that Josh had outbursts at school nearly every day regardless of whether he had visitations, but she stated that on the days on which a visitation was scheduled, "his behavior was above and beyond his daily problem behaviors, and the defecation occurred directly after visitation."

- Dr. Doss participated in a family Zoom meeting, during which she developed concerns because the call "was particularly adversarial," and Parents did not ask how they could help Josh. She acknowledged that the reason that Parents were adversarial was because of some visits that had been canceled, and she further acknowledged that she did not participate in the entire meeting because she had to leave early.

- At some point, Dr. Doss wrote a letter to the caseworker asking that visitation with Parents be stopped because she was concerned that the visits were traumatizing to Josh.

In summary, Dr. Doss did not believe that it would be in Josh's best psychological interest to return home. In her opinion, despite the potential for distress to a child

from moving foster homes, it would still be better for Josh to remain in the Department's care than return to Parents because some of his placements could be helpful, safe environments.

Parents presented testimony to controvert Dr. Doss's testimony about the source of Josh's behavioral issues. Parents, the two nurses, and Josh's godmother all testified that Josh had no issues before he was removed from Parents' care.[14]

- Nurse Carlson described Josh as "a very fragile kid with a severe heart condition[ and] feeding issues" necessitating a type of feeding tube. She was surprised to learn that Josh no longer requires home nursing care and that doctors had determined that he did not need a feeding tube.

- Nurse Traylor, on the other hand, said that she was not surprised that Josh no longer needed a feeding tube or the same level of nursing care that he had while he was with Parents because during her time with them, "[y]ou wouldn't think there was a physical issue going on with him." However, she followed this statement up by saying that it was "very surprising."

- Nurse Carlson stated that Josh did not have the kind of behavioral problems he seems to have now. Nurse Traylor also testified that she had never noticed any bad behavior by Josh.

- Josh's godmother Cathy also testified that before his removal, Josh had stayed with Cathy and her husband every other weekend, and she had never noticed any behavioral issues with Josh before his removal.

---

[14]Regarding the timing of Josh's issues with bathroom functions, we note that the affidavit of Karen Parker, which the Department had attached to its emergency removal affidavit, indicated that Josh had begun to regress on his potty training while still living with Parents. However, the Department did not call her as a witness or introduce her affidavit at trial, and no trial witness testified to that fact. Thus, the only evidence at trial was that Josh did not have problems with bathroom functions before the removal.

- According to Cathy, after Josh's removal, he became a "totally different kid." When he was temporarily placed with her and her husband, he was "sad all the time," and several times he hurt one of her dogs by choking it.

- She acknowledged that Josh's temporary placement with her lasted only three months and that he was removed because of an allegation by Josh that her husband had spanked him; she disagreed with the characterization of spanking, though, saying that her husband had "batted him one time."

- D.T. testified that Josh was a very normal, happy kid with no behavioral issues before he went into the Department's care and that he had no behavioral issues during their visits; D.T. described Josh as very loving to Parents during their visits. B.R. similarly testified that at their visits, Josh was always happy to see them and tells them how much he missed them, that he was terrified when they leave him, and that when he was with them, he did not have the behavioral issues that he has now.

- Regarding Josh's allegation of violence against one of the Parents' dogs, Parents' veterinarian had testified at a previous hearing in the case and had not expressed any concerns about the way they handle their dogs.

- B.R. testified that he had noticed some scratches and bruises on Josh during some visits, and during their first visit, Josh whispered to him, "Dad, that big man pickled my butt," which he considered to be an outcry of abuse.

### 4. Testimony Regarding the Other Children

The Department also put on testimony regarding Ricky, Craig, and a child who had previously been placed with Parents.

- Cruz testified about a previous investigation by the Department when Ricky, who was twelve at the time, had shown up to a dialysis appointment with a black eye and strangulation bruising around his neck. According to Cruz's removal affidavit, at that time, B.R. said that Ricky fell while chasing a cat. At trial, Cruz testified that during her investigation for this case, she asked B.R. about that incident, and he repeated the same explanation that Ricky had tripped over a fence chasing a cat. However, when she asked Ricky about it, he said that he had run into a doorknob.

29

- Dougharty stated that at some point during the case, Parents' visits with Ricky were stopped because of "incidents that were occurring in the visits and [Ricky] not feeling safe."

- D.T. was also asked about A.D., a previous foster child who had been in Parents' care. D.T. denied that she had been removed because of an allegation that he or B.R. had pushed her. He asserted that she had been removed after Parents had "placed her in the psych unit and [given a] 24-hour notice on her" and that the allegation was one that had been "put against [them] after she was removed."

**5. Testimony and Evidence Regarding Parents**

The parties also put on evidence regarding Parents, their ability to care for Josh if he were to be returned to them, and their compliance with their service plan.

- D.T. stated that they plan to keep Josh in therapy if he is returned to them, and they have a room set up for him in their new home.

- D.T. said that Parents had done everything that the Department has asked of them. Dougharty also discussed Parents' service plan and stated that Parents had completed their classes.

- Cruz stated that B.R. believed that he and D.T. were being discriminated against for being in a same-sex relationship. B.R. also testified to that belief, which he said was reflected in an interaction he had at one point with an investigator in the case.[15] B.R. stated that Dr. Doss was against Parents because they are a gay couple. When it was pointed out that Dr. Doss is also in a same-sex relationship, as is Evelyn, he stated that "[i]t's totally different for women."

- Dougharty testified that Parents had not provided her with personal bank statements despite her requesting them and had not provided her with documentation verifying their income from dog breeding.

_____

[15]According to Cruz's testimony, that investigator had accompanied her to interview Adan after his outcry.

30

- Cruz acknowledged that the Department had conducted five previous investigations of Parents, and all had been ruled out by the Department.

Parents used their own counselors for the counseling services that were required under their service plan, and both Parents' therapists testified at trial. Katherine Weber, D.T.'s psychologist, testified about her impression of him and the purpose of her treatment of him.

- Receiving anger management was one of D.T.'s services under his service plan, but Dr. Weber did not feel that D.T. has anger issues.

- D.T. was diligent in his therapy, and nothing had ever been brought up in a session that made her worry about him or B.R. engaging in family violence. She had not observed any inappropriate angry behavior from him.

- She acknowledged that D.T. had told her that B.R. "can get emotional and yells." But she reported that D.T. had told her that Parents do not use corporal punishment.

- Dr. Weber admitted that she had not been made aware of the full extent of Adan's outcry until several months into D.T.'s therapy sessions. She acknowledged that she probably would have viewed D.T. differently if she had seen the removal affidavit from the start of treatment of D.T.

Bryan Duncan, B.R.'s psychologist, testified after Dr. Weber.

- Dr. Duncan began therapy with B.R. in December 2021, before the Department removed the children.

- As Dr. Weber had said regarding D.T., Dr. Duncan did not believe that B.R. met the criteria for an anger management course. However, as an anger management course was one of his services, Dr. Duncan had worked with B.R. to make as much progress "as could be made considering."

- Dr. Duncan was aware of the allegations of abuse and neglect against B.R., and he agreed that the allegations in the affidavit were concerning for anger management. However, he never had any interactions with B.R. that would indicate any difficulty in controlling anger.

31

- Dr. Duncan agreed that first impressions can color a doctor's impression of a client. However, he did not believe that reading the affidavit before treating B.R. would have changed his initial first impression. But if he had known about the allegations at the start, he would have asked B.R. different questions at intake, and depending on how he answered the questions, that could have affected his treatment.

### 6. Application

In summary, regarding Adan, Parents testified that they had never abused any of their children, and the two nurses testified that they never saw any injuries on the children that were unexplained or concerning. The nurses further testified that they fed all the children breakfast every day and that the children had food for lunch. Josh's godmother also testified that she never saw any reason to be concerned about the children and that Adan "lied a lot." Parents' therapists both stated that they did not believe that their clients had anger issues or needed anger management classes.

On the other hand, the Department put on testimony that Adan made an outcry of abuse to the Department's investigator, that he repeated his outcry to the medical staff at Cook Children's, and that throughout his therapy after removal, he consistently maintained those allegations. Evelyn testified that Adan had made an outcry of abuse to her and had told her that he would get in trouble with Parents if they found out that she knew about it. The Department also produced photographs of injuries on Adan at the time of his removal; one of the nurses conceded that the injuries looked concerning, and the other testified that if she saw injuries on a child

like the ones in the photograph, she would have a duty to report them. Those photographs included bruising to Adan's upper arms that looked like grab marks.

Neither parent provided any explanation for those injuries during the investigation other than that Adan had fallen playing outside or riding his bike, and neither parent addressed the injuries during trial. Diego was not living with the family at the time Adan received those injuries, so even if the trial court had found that Diego was aggressive and had episodes of violence against Adan, Diego was not the source of Adan's injuries in the photographs. In their brief, Parents describe the idea that Diego coached Adan to lie as a "compelling . . . notion," but they cite to no evidence of any such coaching, and we have found none in the record.

"[E]ndangering conduct is not limited to actions directed towards the child." *J.O.A.*, 283 S.W.3d at 345. This court has previously held that "[e]xposing a child to family violence endangers a child's physical or emotional well-being and is sufficient to support an endangerment finding." *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *6 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.).[16] Thus, if a parent abuses a child, that conduct can support an endangerment finding as to another child. *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort

---

[16]Adan's outcry was that D.T. would yell, but only B.R. committed the physical abuse against him. Because exposing a child to violence in the home is endangerment, if only one parent commits physical abuse, but the other parent does nothing to protect the child, both parents have endangered the child. *M.M.*, 2021 WL 5227177, at *6.

Worth 2003, pet. denied). Based on the record, the trial court could have formed a firm belief or conviction that Parents abused Adan, and, accordingly, the evidence is factually sufficient to support such a finding. *See A.B.*, 437 S.W.3d at 500 (setting out factual sufficiency standard). It was the trial court's duty to resolve the conflicts in the evidence, and the trial court could have found the evidence of Adan's outcries to be credible, despite the evidence to the contrary.

Adan was consistent in his outcries with Cruz, his therapist, and the medical staff who treated him upon removal. His story was consistent with the photographs of his injuries. Josh's godmother said that Adan "lied a lot," but a neighbor who took Adan to and from school every day said that he was a child she could trust. Although Parents offered controverting evidence about Diego's claims of abuse, whether Josh's behavioral problems were due to neglect and abuse in their care, and whether Adan was ever denied dinner, and they denied ever injuring Adan, they offered no competing explanation at trial for the injuries that Adan had when he made his outcry and no controverting evidence of how he had received those injuries. The trial court heard the explanations that they had given to Cruz in her investigation—that he fell playing outside and that he fell off his bike—but the trial court did not have to find those explanations credible. Adan's medical records stated that his injuries were consistent with abuse. The two nurses testified that they never saw anything that raised a question about abuse in the home, but one of the nurses had not been in the home since 2020, and the other had apparently not noticed the injuries on Adan at the

34

time of his removal. Based on the record, even if the trial court did not believe that Parents had physically abused Diego or any of the other children aside from Adan, the trial court could have found that Parents abused Adan.

Parents argue that Diego clearly lied about the pool incident because Parents' photographs showing some injuries to B.R. proved that Diego was the aggressor in that incident. Regardless of whom the trial court believed to the be aggressor in the pool incident, the trial court could nevertheless have found that Parents abused Adan. Because the evidence was sufficient to support a finding of abuse against Adan, the evidence was sufficient to support a finding of endangerment as to Josh.[17] *See In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (noting that "[i]n a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding"). We overrule Parents' second issue.

## III. Best Interest

In Parents' third issue, they argue that the evidence was factually insufficient to demonstrate that the termination was in Josh's best interest under Texas Family Code Section 161.001(b)(2).

---

[17]For the same reason that the evidence was sufficient to support the endangerment finding as to Josh, it was also sufficient to support the endangerment findings as to the other children.

**A. Standard of Review**

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2).

We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest: (A) the child's desires; (B) the child's emotional and physical needs, now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the child's best interest; (F) the plans for the child by these individuals or, if applicable, by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and (I) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796,

807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B. Analysis**

Parents testified that they had a room set up for Josh at home, that they would keep him in counseling, and that he loved them and wanted to come home with them. *See* Tex. Fam. Code Ann. § 263.307(b)(5) (providing that trial court may consider whether a child is fearful of living in or returning to the child's home); *Holley*, 544 S.W.2d at 371–72 (considering child's desires and plans for the child by individuals seeking custody). Further, D.T. testified that because of the nature of Parents' work as dog breeders, they do not have an 8–5 schedule and are home during the day, and so they would be available to take Josh to school in the morning and pick him up in the afternoon. Dougharty testified that she saw nothing concerning in Parents' visits with Josh. Dr. Doss testified that Josh does not talk about the visits other than to say that he enjoys them and enjoys leaving, but his saying that he enjoys leaving is not by itself enough to show that he did not enjoy the visits. She stated that his defecating on himself immediately after the visits is a sign of trauma, but she did not explain why it could not be a sign of having to leave Parents at the end of the visit rather than a sign that seeing Parents was traumatic for him. She did opine, however,

37

that Josh's behavioral issues were caused by pervasive neglect in Parents' home. *See Holley*, 544 S.W.2d at 371 (considering parental abilities of individuals seeking custody).

Regarding Parents' parental abilities, while the children were in Parents' care, nurses made breakfast and lunch for the children every day; the nurses took care of Ricky and Josh during their shifts; the nurses often made sure that the younger children had their baths for the day; a neighbor took Adan to school and picked him up every day, and the children's respective godparents regularly kept them for weekends. In other words, many of the regular daily duties of a parent were taken care of by people other than Parents. There was scant testimony about what Parents' roles were in caring for the children before removal other than one nurse's testimony that D.T. usually made dinner for the family and Partridge's testimony that one of the dads took "the older boy" to high school in the mornings. *See* Tex. Fam. Code Ann. § 263.307(b)(12) (providing that trial court may consider parent's demonstration of adequate parenting skills); *Holley*, 544 S.W.2d at 371 (considering parental abilities of individuals seeking custody). Further, Dougharty testified that Parents had never provided her with bank statements, despite her asking for them, and she had not received any verification of their income. *See Holley*, 544 S.W.2d at 371 (considering stability of the home).

Regarding Josh's behavioral issues, the trial court had conflicting evidence about whether they were the result of his stay in foster care, but most of the evidence

38

was that the issues arose after removal. Parents, the two nurses, and Cathy all said he did not have behavioral issues before his removal. The Department relied only on Dr. Doss's testimony to establish that the behavioral problems were the result of persistent neglect before removal and presented no witnesses who could testify about Josh's behavior before removal. Dr. Doss did not explain if persistent neglect *before* removal could have been the cause of behaviors that began only *after* removal.

The trial court could have believed that Josh's multiple placements throughout the case had been distressing or even traumatic for him. *See* Tex. Fam. Code Ann. § 263.307(b)(2) (stating that trial court may consider frequency and nature of out-of-home placements). On the other hand, as noted, the trial court could have found that Adan's outcries of abuse were credible. *See id.* § 263.307(b)(7), (12)(E) (providing that courts may consider whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home and whether parent has adequate skills to protect child from repeated exposure to violence although violence may not be directed at the child); *In re E.S.*, No. 02-20-00407-CV, 2021 WL 2149627, at *9 (Tex. App.—Fort Worth May 27, 2021, pet. denied) (mem. op.) (considering history of violence in the home as part of best-interest analysis). That abuse also endangered Josh and was evidence that the parent–child relationship was not a proper one. *See Holley*, 544 S.W.2d at 372.

Based on the record, the trial court had factually sufficient evidence from which it could form a firm conviction or believe that termination was in Josh's best interest. We overrule Parents' third issue.

## Conclusion

Having overruled Parents' three issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: September 14, 2023